UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
WALTER TANNER,

                        Plaintiff                        _____CV_____ (_____) (_____)

   -against-

                                                                                                        COMPLAINT

MTA LONG ISLAND RAILROAD/
DBA METROPOLITAN TRANSPORTATION
AUTHORITY;
Lisa Martinez;
Willie Jenkins;
Kevin McCaffrey;

                        Defendant(s).
------------------------------------------------------------------------X

Plaintiff, Walter Tanner, acting a pro se litigant, seeks protection and relief from federal district court in employment and labor action. Litigation began with the filing of a Notice of Claim in July, 2015 and formally filed in April, 2016 with the New York State Supreme Court, New York County (Index No. 152508/2016) and currently held with the Appellate Division, First Department (2021-04312). In seeking relief for issues presented, Plaintiff seeks to carry-over case to allow the supremacy of court to determine issues based on federal codes, statutes and general provisions of New York state and federal law. Plaintiff asserts, when seeking to move the Justices of the Appellate Division to dismiss Motion for Summary judgement presented at lower (Supreme) Court, the justices of the division denied plaintiff due process in effort to correct errors, omissions and negligence of plaintiff's retained counsel during proceedings of the court of first instance. Plaintiff wishes to carry-over case and seek redress from this court. Plaintiff seeks to enjoin MTA In-house counsel, Kevin McCaffrey, whom served as employee relations advisor and for whom plaintiff alleges discriminated against him, in violation of Title VII of the Civil Rights Act of 1964 (as amended) inter alia, in application of any corporate policy and precedence in applying corrective action up to and including termination and subsequently litigated case in state court

against company policy to send such cases to outside counsel. Insofar as the determination of such action, all defendants abused their authority. Whereas allegations stated in this complaint regarding issues of corporate policy and law, plaintiff reserves right to amend pleading as facts pertinent for court to determine proper relief are uncovered.

## JURISDICTION AND VENUE

1. This court has jurisdiction over this matter pursuant to the general subject matter jurisdiction granted to this court by the United States law and rules of the federal circuit.

2. Venue is proper in New York County because Defendants' business offices are headquartered in this county and Defendants conduct extensive business in this county and greater New York Metropolitan Region.

## PARTIES

3. Plaintiff was an employee of the Defendants from January 2014 until May of 2015.

4. Plaintiff was employed as an HR Business Partner.

5. Defendant MTA Long Island Rail Road (hereinafter referred to as "LIRR") is an agency of the Metropolitan Transportation Authority State of New York.

6. Lisa Martinez is an HR Business Manager for LIRR.

7. Willie Jenkins is an HR Business Director for LIRR.

8. Kevin McCaffrey is a General Attorney for LIRR.

## FACTUAL ALLEGATIONS (as Amended)

9. In or around December of 2014, Plaintiff Tanner was approached by Defendant Willie Jenkins while Tanner was in his office and handed a resume for an applicant interested in working for LIRR.

10. Jenkins told Tanner that the resume is for Lauren Gelormino, daughter of the former Senior Vice President of LIRR and "Kathy gave this to me for the production planner role with (Ann) George."

11. Tanner did not know and have never met Ralph Gelormino the former Senior Vice President ("SVP").

12. Tanner was concerned that the resume he was handed has education and experience significantly and far less inferior to candidates applying for the job and who submitted their resumes to HR that are documented in the LIRR HR record keeping system as required by the hiring rules.

13. Tanner also raised concerns that candidate Gelormino did not submit a resume for the job as required and her resume was not docketed and received by HR through the normal application and hiring process which other candidates complied with and hiring her would be in violation of the anti-nepotism policy as her father's previous position as senior vice president at LIRR HR would give her undue advantage to channel her resume to hiring officers after the closing date to receive resumes.

14. Tanner was concerned that smuggling the resume of a candidate through the back door channel after the application submission deadline has passed was contrary to LIRR personnel rules, unfair to other candidates, abused the process and violated the anti-nepotism policy of the LIRR.

15. The purpose of the Defendant LIRR's anti-nepotism employment policy is to "…establish procedures for the Metropolitan Transportation Authority and its Subsidiaries and Affiliated Agencies ("MTA") to safeguard against the influence of nepotism in employment-related decision-making at the MTA to further ensure that decision-making on employment related matters is based on merit and qualifications."

16. Section II of the policy states, "These procedures apply to all MTA agencies and the employees thereof. For purposes of this Policy employees of MTA shall include employees of MTA headquarters and any of MTA's subsidiaries or Affiliated Agencies (including MTA Long Island Rail Road, MTA Capital Construction Company, MTA Bridges and Tunnels, MTA Bus Company, MTA Metro-North Railroad, MTA New York City Transit, the Manhattan and Bronx Surface

Transit Operating Authority and the Staten Island Rapid Transit Operating Authority) any the employees of any future Subsidiaries or Affiliated Agencies of the MTA."

17. In section IV of the anti-nepotism policy, Defendant LIRR further clarifies its procedure to safeguard against nepotism in hiring and promotions as follows: "MTA has a zero tolerance policy with respect to nepotism in hiring and promotion decisions. MTA agencies shall enforce the procedures and requirements below to implement the prohibitions on nepotism in connection with hiring and promotions contained in state law and in the MTA Code of Ethics and to advance this policy. Compliance with anti-nepotism prohibitions is a MTA-wide priority is not acceptable; violations will be treated as serious rule transgressions resulting in appropriate discipline."

18. Tanner, concerned that there are issues in candidate Gelormino's application process that raised the need for discussions of the anti-nepotism policy expressed his views and concerns to Jenkins.

19. Tanner also raised his concern that the manner he was told to consider the resume of Gelormino may violate the anti-nepotism policy in a discussion with Anne George ("George") the hiring manager requesting to hire Gelormino.

20. Tanner emailed George that the candidacy of Gelormino would not be considered because Gelormino did not submit her resume through the business service center and the resume was submitted after the closing date.

21. George did not response to Tanner's email on the ineligibility of Gelormino.

22. When Tanner informed Jenkins of the ineligibility of candidate Gelormino, Jenkins told Tanner that "you need to understand how the politics is played around here."

23. Tanner also brought his complaint of a possible violation of the anti-nepotism policy to the attention of Ms. Meilick the Senior Director of LIRR HR.

4

24. Ms. Meilick stated she only wished to have Gelormino's resume as part of the pool of candidates and should not receive special treatment, contrary to statements made by Jenkins.

25. After the statement regarding how politics is played at LIRR, Jenkins became antagonistic and hostile towards Tanner because of Tanner's view of the Gelormino's candidacy.

26. Martinez also became hostile towards Tanner after Tanner expressed his view to her that Gelormino did not meet eligibility requirement because of the way her resume was handpicked by Jenkins for special consideration that mocked the merit and fitness requirements of the LIRR.

27. Martinez began to unnecessarily question Tanner's judgment about his job performance and experience and added nonsensical issue regarding tone with other staff when he spoke to fellow employees and accused him falsely of making unspecified sarcastic statements.

28. Although the Defendants never told Tanner directly that he was being punished for his stand on the Gelormino candidacy he was singled out for work improvement plan that was unnecessary by Martinez and Jenkins due to Tanner being a non-union, professional staff member. Jenkins and Martinez on multiple occasions told Tanner that he screwed up the candidacy of Gelormino without a good reason on issues and/or perpetuated rationale on basis of a clerical nature which should be relegated to union HR staff assistants, in violation of labor contract in force at that time.

29. Subsequent to the conversation between with Jenkins, Tanner was instructed sometime in December of 2014 to send a letter of rejection to Gelormino.

30. Although the Gelormino files were submitted to Tanner's supervisors in November of 2014, Martinez and Jenkins which could have been remedied clerical issues regarding explanations of unpaid taxes, working off the books and lack of requisite experience and skills necessary for the job she was applying at LIRR.

31. Although Tanner was instructed by Jenkins to write a letter of rejection to Gelormino in December of 2014, the Defendants harassed Tanner with emails and questions regarding the Gelormino application and was subjected to intense, frivolous, manufactured, fabricated written warnings well after Tanner returned to office after spending the month of March, 2015 in grand jury duty.

32. After returning from grand jury duty in April, 2015 Tanner was subjected to a barrage of questions and emails regarding his action on a bizarre self-serving email addressed to Ms. Meilick (now Senior Vice President of Administration) by candidate Gelormino two months after his contact with Gelormino in which Gelormino sought to retract her previous written assertion that she was paid off the books by a subway sandwich franchise while employed by the fast food outlet.

33. Jenkins told Tanner that he was going to hire Gelormino for another position.

34. Martinez and Jenkins questioned every aspect of Tanner's work in order to cast aspersion on his professional integrity because of the anti-nepotism stand that he took in the Gelormino matter.

35. The anti-nepotism policy is addressed to current employees and their family members. It is, however, clear that the policy itself forbids the provision of unfair advantage to any one candidate because of family relations or favorable assistance by an in house staff

36. The Anti-Nepotism policy is designated as policy number 11-051 and is effective from September 30, 2013.

37. The anti-nepotism policy is a policy each LIRR employee is directed to follow in strict compliance and embedded in it is a declaration of zero tolerance for nepotism.

38. The policy is a binding directive on all employees to ensure their compliance with its provisions.

39. The administration of the policy contains an implicit recognition that employees cannot be disciplined or terminated for invoking in good faith the procedure outlined in the anti-nepotism policy.

40. The anti-nepotism policy represents parts of the terms and conditions of employment for Tanner.

41. Tanner also complained to the MTA Inspector General who interviewed him regarding his complaint but did not take any steps beyond the interview.

42. The defendants have no right to create hostile work environment for Tanner and subsequently terminate him from employment because he raised opposition to the employment of a candidate who is the daughter of a former senior VP for Operations with LIRR and whose resume was smuggled to Tanner for hiring outside of the established hiring rules and procedures by Defendants Jenkins and Martinez.

43.  Pursuant to the rights provided by statutes and rules governing the policies protected by the anti-nepotism policy Tanner cannot be terminated for raising in good faith the issue of nepotism and unfair advantage that Jenkins and Martinez attempted to provide to Gelormino.

44. Jenkins and Martinez have no right to frustrate and orchestrate the termination of Tanner as they did.

45. Tanner did not break any rule or policy that would warrant his termination.

46. Tanner was denied raise in pay and was informed by Martinez that it was at directive of Ms. Meilick, Sr Director of HR.

47. Tanner's termination was a vindictive act by Jenkins and Martinez calculated to punish Tanner for his stand on matter presented and an effort to orchestrate hysteria to gain recognition for job promotion.

48. On or about May 22, 2015 the Defendants terminated Tanner in an obnoxious and disgraceful manner.

49. Tanner was told to report to the fifth floor pursuant to instructions from Jenkins for a staff meeting on May 22, 2015 when no staff meeting was scheduled for the venue and no other staff was present except Michael Nerrissian, another HR Business Director and peer to Jenkins.

50. Upon reporting to the fifth floor Tanner was informed by Jenkins that he was being terminated for performance and after Tanner asked if he could go back to his desk and retrieve belongings or will they be sent to him, Tanner got up form table and walked in the office of Marilyn Kustoff, Director of Labor Relations. These officers said nothing to Tanner. They looked at him in an intimidating fashion, confined and restricted his movement, watched every move he made, followed him down the stairs completely surrounding him in a disciplined and organized military fashion.

51. Upon leaving Ms. Kustoff's office, Tanner surrounded by a dozen armed police in full arrest profile and demeanor. Tanner was extremely fearful for his personal safety and life as a result of this heavy police presence.

52. These dozen officers followed Tanner from the second floor to the fifth floor completely circling him around on the second floor and watching him sternly as he picked up his belongings from his second floor office.

53. As Tanner exited his work area and moved towards the elevators the officers continue to surround him with the entire office workers whispering and appearing to be in a state of shock as they watched Tanner marched out of the work area by the police officers like a common criminal into the elevator with his head bowed, psychologically subdued and totally humiliated.

54. The dozen officers, under the command of Lt. Howell, who was in charge of the police unit followed Tanner into the elevator and surrounded him in the elevator very tightly.

55. The unit exited the elevator with Tanner and followed him as he exited the property and disappeared into the street.

56. LIRR does not engage a dozen police officer to escort and intimidate staff that have been terminated from the services of the LIRR, even those that have engaged in physical altercations on company property.

57. Tanner suffered humiliation and emotional distress because of the treatment from the police treatment and the punishment meted out to him.

58. Absent Tanner's stand on the Gelormino candidacy he would not have been terminated and all the false charges regarding his communications skills and work improvement plan would not have been brought.

59. Tanner suffered emotional trauma as a result of prolonged experience of intimidation and abuse from the Defendants.

## AS AND FOR A FIRST CAUSE OF ACTION

60. Paragraphs 1 thru 60 are realleged as if set forth herein verbatim and incorporated by reference.

61. Defendants violated Tanner's rights under Article I Section 11 of the New York State Constitution which provides that no person shall be denied equal protection of the laws of this state or any subdivision thereof.

## AS AND FOR A SECOND CAUSE OF ACTION

62. Paragraphs 1 thru 64 are realleged as if set forth herein verbatim and incorporated by reference.

63. Defendants violated Tanner's rights when they subjected him false imprisonment, by allegation of counsel, Kevin McCaffrey, that he was being attacked by plaintiff, whom he did not meet until August, 2015. Officers surrounded him with a unit of police officers for a prolonged period of time and not allowing him to move freely when he posed no danger to anyone or to peace.

64. Defendants are liable for false imprisonment.

## AS AND FOR A THIRD CAUSE OF ACTION

65. Paragraphs 1 thru 67 are realleged as if set forth herein verbatim and incorporated by reference.

66. Plaintiff was damaged by Defendants when Defendants engaged in breach of contract when they failed to uphold the terms and conditions of Plaintiff's employment that forbids retaliation or

punishment for a good faith objection to personnel actions based on provisions of anti-nepotism policy and procedure

67. Defendant's contravened New York State At-Will employment doctrine in application of termination proceedings by subjecting plaintiff to unnecessary, frivolous, fabricated, manufactured (written) evidence to justify discharge.

68. Defendants breached their employment contract with Tanner when they terminated him for raising a good faith objection grounded on the anti-nepotism policy.

### AS AND FOR A FOURTH CASE OF ACTION

69. Paragraphs 1 through 70 are realleged as if set forth herein verbatim and incorporated by reference.

70. Plaintiff was damaged by defendants' violation of the 1st and 14th Amendments to the U.S. Constitution. The Equal Protection Clause of the 14th Amendment provides inter-alia; "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

71. Defendants violated the First Amendment and the equal protection clause of the 14th Amendment when they denied Tanner equal protection of the law by subjecting him to terms and conditions of employment different from those offered to staff in LIRR H.R who did not complain or raise any objection based upon anti-nepotism.

### AS AND FOR A FIFTH CAUSE OF ACTION

72. Paragraphs 1 through 73 are realleged as if set forth herein verbatim and incorporated by reference.

73. Plaintiff was damaged by defendants' violation of Civil Rights Act of 1866, as amended, 42 U.S.C §1981. The Act provides in pertinent part, that "(a) … persons shall have the same right to make and enforce contracts as is enjoyed by white citizens." Violations of 42 USC 1981 and the US constitution can also be enforced pursuant to 42 USC 1983.

74. Defendants treated Tanner differently because he is Black man who raised potential violation of the anti-nepotism policy.

75. Defendants violated the Civil Rights Act of 1866 when they subjected Tanner to discrimination in the work place.

## AS AND FOR A SIXTH CAUSE OF ACTION

76. Paragraphs 1through 77 are realleged as if set forth herein verbatim and incorporated by reference.

77. Plaintiff was damaged by Defendants' violation of the Civil Rights Act of 1871, 42 U.S.C §1983. The Act protects against the deprivation of Federal Constitutional Rights, and rights under federal law by persons acting under color of state or local law as defendants did in the instant case.

78. Defendants violated Tanner's rights when they used the power of their municipal offices to deny him equal protection of the law.

## AS AND FOR A SEVENTH CAUSE OF ACTION

79. Paragraphs 1 thru 83 are realleged as if set forth verbatim and incorporated by reference

80. Plaintiff's rights to be free from tortious interference with his employment contract were denied when defendants punished and engaged in retaliatory actions by discharging Tanner from employment in a manner that constituted tortious interference with employment contract.

81. Defendants tortuously interfered with Tanner's employment contract.

82. Defendants abused their authority over Tanner in concert with relevant statutes, policies, rules or case precedence in concerning such acts as employees of a state public benefit corporation.

## RELIEF

WHEREFORE, plaintiff suffered financial, emotional/mental distress, due to meandering of supervisory and management personnel.  In addition, plaintiff endured significant blow to

professional reputation and employment prospects due to risk and perception of litigants seeking relief. Plaintiff demands the following relief, jointly and severally against all the Defendants or as otherwise stated:

a. A Declaratory judgment that the conduct, practices, and acts complained of herein are illegal.

b. Reinstatement of Plaintiff to his employment with MTA with original hire date of January 6, 2014.

c. An order granting damages totaling the greater of $85,000,000.00, back pay (grossed up and at level of other HR Business Partners).

d. Credit and vesting in MTA Pension Plan.

e. All time off banks maxed out upon reinstatement.

f. Expungement of negative, derogatory, fabricated notices, letters and/or other instruments used to perpetuate unjustified termination from personnel file.

g. An order granting punitive damages against Defendants.

h. Any and all further relief in law and equity deemed necessary by the Court.

Respectfully submitted,

*/s/ Walter Tanner*

By: _____
    Walter Tanner
    Pro Se
    November 18, 2022

Address:   134-35 166th Place, #4G
                Jamaica, NY 11434

Telephone:  347-558-0647